**LINDY PEN COMPANY, INC., and Blackfeet Plastics, Inc., Plaintiffs,**

v.

**BIC PEN CORPORATION, Defendant.**

**No. CV 80–0010–CCH.**

United States District Court,
C.D. California.

Oct. 27, 1982.

Marvin H. Kleinberg, Inc., Marvin H. Kleinberg, Thomas A. Turner, Jr., Beverly Hills, Cal., for plaintiffs.

Elwood S. Kendrick, Inc., Kendrick, Netter & Bennett, Frederick A. Lorig, Los Angeles, Cal., Pennie & Edmonds, Thomas F. Reddy, Jr., George F. Long, III, Rory J. Radding, New York City, for defendant Bic Pen Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CYNTHIA HOLCOMB HALL, District Judge.

This action came before the Court for trial June 22 through July 1, 1982. The Court, having considered the evidence and briefs of the parties, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff, Lindy Pen Company, Inc. (Lindy), a California corporation having its principal place of business in North Hollywood, California, manufactures and sells various types of ball point pens identified by the trademark and name LINDY.

2. On or about December 4, 1981, plaintiff Blackfeet Plastics, Inc. (Blackfeet) acquired substantially all of the assets of plaintiff Lindy, including the trademark and name LINDY. Blackfeet is a Montana corporation, having its principal place of business in Browning, Montana.

3. Defendant Bic Pen Corporation (Bic), formerly known as Waterman-BIC Pen Corporation, is a New York corporation having its principal place of business at Milford, Connecticut. Bic manufactures

and sells various types of ball point pens throughout the United States (including the Central District of California), identified by the trademark and name BIC.

4. On September 20, 1966, United States Trademark Registration No. 815,488 was issued to Lindy for the word "Auditor's" in connection with ball point pens. Lindy perfected the registration by filing declarations under Sections 8 and 15 of the Lanham Trademark Act, 15 U.S.C. §§ 1058 and 1065. Lindy assigned this trademark to Blackfeet on December 2, 1981.

5. Lindy has been diligent in policing adoptions of the term "Auditor's" or variations thereof as marks for ball point pens. In some ten instances Lindy has notified various ball point pen manufacturers or distributors of its trademark, each of whom, including Bic, voluntarily stopped using the term "Auditor's."

6. In March, 1965, Bic published a catalog showing, and apparently sold, ball point pens having the mark "Auditor's" stamped on their barrels. On May 17, 1965, Mr. Sidney Linden, president of Lindy, wrote to Bic claiming trademark rights in the term "Auditor's" and requesting that Bic cease its use of that mark. Thereafter, correspondence ensued between outside counsel for Bic and counsel for Lindy. The "controversy" was resolved by Bic's agreeing to cease the use of the term "Auditor's" on its pens after the exhaustion of its then existing inventory.

7. In 1979 Bic began selling ball point pens with the legend "Auditor's Fine Point" stamped on the barrels. For 14 years prior to 1979, Bic did not use such a legend or term on any of its products.

8. Bic decided to adopt the legend "Auditor's Fine Point" in 1979 upon the suggestion of Joel Fishkin, Bic's national commercial sales manager. Mr. Fishkin proposed to take Bic's "Fine Point" pen and "dress it up" to justify a higher list price. The pen was to be sold in the commercial market at a price substantially reduced from the list price. Bic chose the term "Auditor's" to identify the pen as having an extra-fine point. Bic did not use its existing legend "Accountant Fine Point" because it did not want to interfere with sales of that pen, which is sold in the retail market.

9. Before Bic approved the use of the legend "Auditor's Fine Point," Bic's in-house counsel Alan Lipson made an inquiry into the propriety of using that legend. Mr. Fishkin showed Mr. Lipson three catalog sheets and a pen, all from different manufacturers, in which the term "Auditor's" or "Auditor" was used to describe a ball point pen. One of the catalog sheets was for Lindy pens. The catalog sheet made no reference to any claim of a proprietary interest, such as a trademark, for the term "Auditor's." After reviewing this information, Mr. Lipson concluded that the terms "Auditor" and "Auditor's" were commonly used descriptive terms in which no one was claiming registration rights. At the time Bic began using the legend "Auditor's Fine Point" in 1979, it was unaware of Lindy's registered trademark. All references to the earlier 1965 correspondence between Bic and Lindy were held by outside counsel and were unknown to in-house counsel.

10. Mr. Lipson first became aware of Lindy's registered trademark when Lindy filed its complaint. Lindy made no attempt to contact Bic to discuss Bic's use of the legend "Auditor's Fine Point" prior to filing the complaint.

11. The term "Auditor's" was selected by Lindy and has been used by it to inform purchasers that these fine point pens were designed for or would appeal to auditors, accountants and others requiring a fine-point pen.

12. Lindy's customers, when ordering pens of the type in suit, primarily refer to them as "460–F", a model number used by Lindy.

13. Bic's legend "Auditor's Fine Point" was intended as a grade or style designation, as distinguished from other writing instruments manufactured by Bic and bearing such legends as Medium Point, Deluxe Medium Point, Fine Point and Accountant Fine Point. All of these pens were also

identified by defendant's trademark and name BIC.

Bic chose the term "Auditor's" to identify the pen as having a fine point, and to be able to list the pen at a higher price than its "Fine Point" pen. In addition, Bic did not want to interfere with sales of its "Accountant's Fine Point" sold in the retail market.

14. The pens in suit are distinguishable. In addition, the packaging and collateral display materials used by the parties in connection with the sale of the respective pens are dissimilar in graphics and textual content.

15. The trademarks and names BIC and LINDY are prominently and repeatedly displayed on the parties' respective packaging and collateral promotional materials so as to avoid any likelihood of confusion, mistake or deception as to source, sponsorship or origin.

16. The term "Auditor's" signifies a class of end·users as well as a specific type or model of fine point pen manufactured by plaintiffs and defendant.

17. While Lindy advertised its pens, it has failed to establish that it spent significant sums advertising its "Auditor's" pens as opposed to its other pens or Lindy pens in general.

18. Sales of Lindy's pens have been decreasing for several years. The decreasing sales of the "Auditor's" pen is consistent with the overall decline in Lindy's business.

19. *Strength of Plaintiffs' Trademark.* Plaintiffs' mark is weak. "Auditor's" is a meaningful word in common usage and, when used in the present context, denotes a type or model of pen distinguishable from broad point pens, laundry and dry cleaning pens, chain-type pens, steno pens, desk pens and other models or types of pens manufactured and sold by plaintiffs and identified by the trademark and name LINDY.

20. *Similarity of the Marks.* Although Bic uses the term "Auditor's," it is used in conjunction with other words ("Fine Point") and defendant's trademark and name ("BIC"). Considering the marks and names

in their entirety and as they appear in the marketplace, the marks are not confusingly similar.

21. *Evidence of Actual Confusion.* There has been no showing of actual confusion.

22. *Proximity of the Goods and Marketing Channels Used.* Bic sells the "Auditor's Fine Point" in the mail order and telephone solicitation markets for resale to commercial and industrial users. Some of these pens have been distributed for sale in the retail market by third parties. While the exact percentage of "Auditor's Fine Point" pens produced that reaches the retail market is unknown, it is only a small percentage. Plaintiffs sell the "Auditor's" pen to wholesalers for resale in the retail market. Although some of Bic's "Auditor's Fine Point" pens reach the retail market, on balance it is not significant enough to put the two companies in the same channel of trade.

23. *Defendant's Intent in Selecting the Mark.* There is no indication in the record that defendant sought to capitalize on plaintiffs' mark. Defendant's use of its trademark and name "BIC" rebuts such an inference. As set forth above, Bic chose the term to identify its pen as having an extra-fine point.

24. *Likelihood of Expansion.* There is no indication that Bic intends to introduce the "Auditor's Fine Point" pen into the retail market. To do so could damage the sales of its "Accountant Fine Point" pen. At this time it is only speculative whether Blackfeet will distribute Lindy products in the commercial market. In fact, the record indicates that one of Blackfeet's reasons for purchasing Lindy was to enter in the *retail* market.

25. *Type of Goods and the Degree of Care Likely to be Exercised by the Purchaser.* Plaintiffs and defendant sell ball point pens of a variety fairly described as relatively inexpensive, throw-away ball point pens having non-replaceable ink cartridges so that when the ink supply is exhausted it is expected that the customer will discard

the pen and purchase a new one. There is no indication that purchasers of plaintiffs' and defendant's ball point pens do not exercise ordinary caution.

26. To the extent that any Conclusions of Law are deemed Findings of Fact, they are incorporated herein.

## CONCLUSIONS OF LAW

1. To the extent that any Findings of Fact are deemed Conclusions of Law, they are incorporated herein.

I. *Jurisdiction.*

2. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331(a) and 1338(a). Venue is proper under 28 U.S.C. § 1391(c).

II. *Trademark Infringement, Unfair Competition and False Designation of Origin.*

3. For plaintiffs to succeed on their trademark infringement, unfair competition or false designation claims, the Court must conclude that defendant's use of plaintiffs' mark will cause a likelihood of confusion or deception as to the origin of the goods. *New West Corp. v. Nym Co.,* 595 F.2d 1194, 1201 (9th Cir.1979); *Carter-Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794, 799–800 (9th Cir.1970); *Golden Door, Inc. v. Odisho,* 437 F.Supp. 956 (N.D. Cal.1977), *aff'd,* 646 F.2d 347 (9th Cir.1980). The same finding is required under California law. *Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 791 (9th Cir.1981). "The test is not that there might be a *possibility* of confusion as to the source of plaintiffs' and defendant['s] business, but rather whether there is a likelihood of confusion as to source." *HMH Publishing Co. v. Lambert,* 482 F.2d 595, 598 (9th Cir.1973).

4. The Ninth Circuit in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–349 (9th Cir.1979), set forth the following factors to consider in determining whether confusion is likely:

(A) *Strength of plaintiffs' trademark.* "A 'strong' mark is one which is used only in a 'fictitious, arbitrary and fanciful manner' ... whereas a 'weak' mark is a mark that is a meaningful word in common usage ... or is merely a suggestive or descriptive trademark .... A 'strong' mark is entitled to a greater degree of protection than is a 'weak' one because of its unique usage ...." *New West Corporation v. NYM Co.,* 595 F.2d at 1201–02 (quoting *J.B. Williams Co. v. Le Conté Cosmetics, Inc.,* 523 F.2d 187 (9th Cir.1975) (citations omitted)). Plaintiff's mark is weak.

(B) *Similarity of the marks.* "Similarity of the marks is tested on three levels: sight, sound, and meaning .... Each must be considered as they are encountered in the marketplace." *AMF Inc. v. Sleekcraft Boats,* 599 F.2d at 351. *See also, Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 444 (9th Cir.1980); *Pignons S.A. de Mecanique dePrecision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981). The marks in suit are not confusingly similar.

(C) *Evidence of Actual Confusion.* " 'Evidence that use of two marks has already led to confusion is persuasive proof that future confusion is likely .... Proving actual confusion is difficult, however, ... and the courts have often discounted such evidence because it was unclear or insubstantial' .... Moreover, selection of a mark with a common word, just as one with a common surname, 'naturally entails a risk of some uncertainty and the law will not assume absolute protection.' " *Alpha Indus:, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d at 445 (citations omitted). Here there has been no showing of actual confusion.

(D) *Proximity of the Goods and the Marketing Channels Used.* Convergent marketing channels increase the likelihood of confusion, *AMF Inc. v. Sleekcraft Boats,* 599 F.2d at 353, but the Court should consider the entire situation "on balance" in determining whether products are in the same channel of trade. *See Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d at 445. The pens in suit are generally not in the same channel of trade.

(E) *Defendant's Intent in Selecting the Mark.* "If the latecomer adopts the name or mark deliberately to capitalize on the

prior user's tradename and thus cause and benefit from confusion, that is an important factor in finding the likelihood of confusion." *Id.* at 446. To raise an inference of a likelihood of confusion, plaintiffs must show that Bic intended to profit by confusing consumers. *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d at 791 n. 2. There is no indication in the record that defendant sought to capitalize on plaintiffs' mark.

(F) *Likelihood of Expansion.* "[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d at 354. There is no such finding in this case.

(G) *Type of Goods and the Degree of Care Likely to be Exercised by the Purchaser.* "In assessing likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Id.* at 353.

5. The Court's findings of fact regarding these factors are set forth above. Based on those findings, I conclude that there is no likelihood of confusion as to the source of plaintiffs' or defendant's pens, and that Bic has not infringed plaintiffs' trademark and is not guilty of unfair competition or false designation of origin.

III. *Incontestability*

6. Plaintiffs' trademark is valid and "incontestable" under § 15 of the Lanham Trademark Act, 15 U.S.C. § 1065.

7. Assuming that § 15 may be used as a "sword," *see Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 371–377 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *but see Tillamook County Creamery Ass'n v. Tillamook Cheese and Dairy Ass'n*, 345 F.2d 158, 163 (9th Cir.), *cert. denied*, 382 U.S. 903, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965), I find that defendant uses the term "Auditor's" "otherwise than as a trade or service mark" and that the term "is descriptive of and used fairly and in good faith only to describe . . . its pens." 15 U.S.C. § 1115(b)(4). Defendant uses the legend "Auditor's Fine Point" to tell the

public what type of product it is by referring to a class of user for whom the pen is suited. Defendant's "fair use" is therefore a defense to infringement. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 12 (2d Cir.1976); *see generally Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1027 (7th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); 1 J. McCarthy, *Trademarks and Unfair Competition* § 11.17 (1973). When a plaintiff chooses a mark with some descriptive qualities, he cannot exclude all competing uses even though the mark is properly registered. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d at 12. As in that case, "it is significant that [Bic] did not use ['Auditor's'] alone . . . as it would doubtless have done if confusion had been intended." *Id.* at 13. And even if Bic were aware of plaintiffs' trademark, more than simple knowledge of prior use is needed to show an intent to misappropriate good will where, as here, plaintiffs chose a highly descriptive mark and defendant merely chose a descriptive word to identify its product. *E.R. Squibb & Sons, Inc. v. Cooper Laboratories, Inc.*, 536 F.Supp. 523, 532 (S.D.N.Y.1982).

IV. *Breach of Contract*

8. Plaintiffs' breach of contract claim is groundless. The record is devoid of any evidence of a binding agreement between the parties precluding Bic from using the term "Auditor's."

V. *Dilution*

9. Bic has not diluted plaintiffs' trademark within the meaning of California Business and Professional Code § 14330. "The dilution doctrine has been described as granting protection 'to strong, well recognized marks even in the absence of a likelihood of confusion, if defendant's use is such as to tarnish, degrade or dilute the distinctive quality of the mark.'" *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d at 793. Plaintiffs' mark is neither strong nor distinctive and plaintiffs have failed to prove that Bic has tarnished, degraded or diluted

plaintiffs' mark. *See AMF Inc. v. Sleek-craft Boats,* 599 F.2d at 345 n. 1.

### VI. *Reverse Confusion*

■ 10. Plaintiffs have failed to establish "reverse confusion" as defined by the Court in *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1371 (10th Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). As discussed above, there is no likelihood of confusion as to the source of plaintiffs' or defendant's pens.

### VII. *Additional Conclusions of Law.*

11. Plaintiffs' mark is "merely descriptive" and not "suggestive"; little imagination is needed to reach a conclusion as to the nature of the product. Allowing plaintiffs the exclusive use of the term "Auditor's" would unduly inhibit the legitimate use of the mark by other sellers; and there is no indication that the public views plaintiffs' trademark as an indication of the product's origin rather than a description. *See AMF Inc. v. Sleekcraft Boats,* 599 F.2d at 349.

12. Plaintiffs have not shown that their trademark has acquired secondary meaning. "The basic element of secondary meaning is a mental recognition in buyers' and potential buyers' minds that products connected with the symbol or device emanate from or are associated with the same source. As recognized in this circuit, '[s]econdary meaning has been defined as *association* [,] nothing more.'" *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 820 (9th Cir. 1980). The words must connote to the public a product from a unique source. 1 J. McCarthy, *Trademarks and Unfair Competition* § 11:9 (1973).

13. Defendant's estoppel argument and reliance on the pre-Lanham Act case *Walgreen Drug Stores, Inc. v. Obear-Nester Glass Co.,* 113 F.2d 956 (8th Cir.), *cert. denied,* 311 U.S. 708, 61 S.Ct. 174, 85 L.Ed. 459 (1940), is without merit and was previously rejected by this Court.

Accordingly, judgment shall be entered in favor of defendant Bic and against plaintiffs Lindy and Blackfeet.