**LINDY PEN COMPANY, INC., and Blackfeet Plastics, Inc., Plaintiffs-Appellants,**

v.

**BIC PEN CORPORATION, Defendant-Appellee.**

No. 82–6053.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1983.

Decided Feb. 16, 1984.

Stephen R. Smith, Morgan, Finnegan, Pine, Foley & Lee, New York City, Thomas A. Turner, Jr., Seymour A. Scholnick, Beverly Hills, Cal., for plaintiffs-appellants.

Thomas F. Reddy, Jr., Pennie & Edmonds, New York City, for defendant-appellee.

Before HUG and FLETCHER, Circuit Judges, and INGRAM,* District Judge.

FLETCHER, Circuit Judge:

Lindy Pen Company, owner of a trademark registration for the word "Auditor's" in connection with ballpoint pens, sued Bic Pen Corporation for trademark infringement, unfair competition, breach of contract and trademark dilution. After a bench trial limited to the issues of liability, the district court entered judgment for Bic on all claims. *Lindy Pen Co. v. Bic Pen Corp.*, 550 F.Supp. 1056. Lindy appeals.

---

* Hon. William A. Ingram, United States District Judge for the Northern District of California, sitting by designation.

## BACKGROUND

Both Lindy and Bic manufacture a variety of ballpoint pens. In 1955, Lindy began to use the word "Auditor's" in connection with the sale of its 460–F model fine point, non-refillable, stick pen. In 1966, Lindy obtained federal trademark registration for the use of "Auditor's" in connection with the sale of ballpoint pens. Lindy imprints the mark on the barrel of its model 460–F fine point pens and uses it on the packaging and advertisements for 460–F pens. Lindy sells most of its 460–F pens to the retail trade. The record appears to indicate that Lindy has also sold 460–F pens to at least one distributor in the commercial trade.[1]

Bic manufactures a fine point pen, model PF, imprinted with the phrase "Auditor's fine point." It adopted the designation in 1979 in order to distinguish its PF pen from its retail fine point and accountant fine point pens. The Bic PF is functionally identical to these retail fine point pens, but has a differently colored hexagonal barrel and contrasting cap and button. Bic sells its PF pens to the commercial office supply trade and sells its fine point and accountant fine point pens to the retail trade. Because the pricing structure of the retail market differs from that of the commercial market, Bic decided to sell a distinct product line exclusively to commercial accounts to avoid the possibility of price erosion between markets. The trial court found, however, that a small number of Bic's PF pens reached retail outlets.

Lindy filed suit in 1980. While the lawsuit was pending, Lindy sold its assets to Blackfeet Plastics, Inc. Blackfeet Plastics was joined as a plaintiff before trial. Lindy and Blackfeet Plastics appeal the district court's judgment for Bic on Lindy's trademark infringement and breach of contract claims.

## I. Trademark Infringement.

The essential question in a trademark infringement case is whether the alleged infringement creates a likelihood of confusion. *Shakey's, Inc. v. Covalt,* 704 F.2d 426, 431 (9th Cir.1983); *Jockey Club, Inc. v. Jockey Club of Las Vegas, Inc.,* 595 F.2d 1167 (9th Cir.1979). Unless there is a likelihood of confusion, there is, under the Lanham Trademark Act, no liability for trademark infringement. 15 U.S.C. § 1114 (1976). *See Carson Manufacturing Co. v. Carsonite International Corporation,* 686 F.2d 665, 670 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983). In an infringement suit, the plaintiff bears the burden of proving likelihood of confusion, *see Golden Door, Inc. v. Odisho,* 646 F.2d 347, 349 (9th Cir.1980), which "exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Alpha Industries v. Alpha Steel Tube & Shapes,* 616 F.2d 440, 443 (9th Cir.1980) (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir. 1978)).

We treat a determination of the likelihood of confusion as a conclusion of law premised on an analysis of a number of subsidiary factors, including the strength of plaintiff's mark, the similarity of the marks, the similarity of plaintiff's and defendant's goods and the proximity of their marketing channels, evidence of actual confusion, defendant's intent in selecting the mark, the type of goods and the degree of care exercised by purchasers. *See Carson Manufacturing Co. v. Carsonite International Corporation,* 686 F.2d at 670–71. We consider these factors to be "foundational facts" and review them under the clearly erroneous standard. *Alpha Industries v. Alpha Steel Tube & Shapes,* 616 F.2d at

---

1. The parties stipulated that Lindy's 460–F pens were "sold primarily to wholesalers for resale to retailers, and to the commercial trade." At trial, Lindy presented the testimony of a former employee of a commercial outlet that his company had handled Lindy 460–F pens. In addition, Lindy's president testified that Lindy sold unspecified models to various customers in the commercial trade, and that Lindy had developed its model 850 pen especially for the commercial trade.

443–44; see *Golden Door, Inc. v. Odisho,* 646 F.2d at 349.

### A. Foundational Facts.

The district court found that "Auditor's" was a weak mark, that there was no evidence of actual confusion, that Bic adopted the designation "Auditor's fine point" without intent to capitalize on Lindy's mark and that, although the pens were inexpensive, Lindy had made no showing that purchasers failed to exercise ordinary caution. None of these findings is clearly erroneous. The record indicates that a number of competing pen manufacturers had used or were using "Auditor's" to designate fine point pens at the time Lindy adopted the word as a trademark. Prior to selecting "Auditor's" to designate its PF pen, Bic determined that several brands of pens advertised "auditor's point" or "auditor's extra fine point" pens. Bic elicited testimony from Lindy's witnesses that "Auditor's" indicated a pen with an extra fine point. Lindy introduced no evidence of actual confusion[2] and no testimony indicating purchaser carelessness.

The district court also found that Bic and Lindy sold the PF and 460–F pens in different markets, and through different marketing channels. Finally, the district court concluded that Lindy's "Auditor's" mark and Bic's "Auditor's fine point" mark were not confusingly similar because they appeared in conjunction with "BIC" and "LINDY" on pens, packaging and promotional material that were dissimilar in appearance. Lindy challenges both of these findings as clearly erroneous. We reverse the district court's finding that Lindy and Bic sell the pens in different marketing channels, and reverse in part the finding that the marks are not confusingly similar.

### 1. Marketing Channels.

■ Much of the testimony given at trial focused upon the marketing channels in which the 460–F and PF pens are sold. The district court determined that Bic sold its PF pens to mail order and telephone solicitation markets for resale to commercial users, but that some Bic PF pens reached the retail market. It found that Lindy sold 460–F pens to wholesalers for resale to retail customers. Despite the parties' stipulation that Lindy sold some 460–F pens in the commercial market and testimony indicating that Lindy had sold 460–F pens to at least one commercial distributor, the district court made no express finding as to Lindy's past or current presence in the commercial market.[3] We hold that the determination that the two companies are not in the same channel of trade is clearly erroneous. In *Alpha Industries v. Alpha Steel Tube & Shapes,* 616 F.2d at 445, we concluded that some overlap in channels of trade was, on balance, not significant enough to put the companies in the same channel of trade where the goods sold were related but not identical, the purchasers were two distinct groups, the buyers were knowledgeable and the items were expensive. Here, in contrast, the ballpoint pens are essentially interchangeable, the purchasers overlap and are regularly exposed to pens sold in both commercial and retail markets, and the pens are inexpensive, disposable items. In view of the court's finding that some percentage of Bic's PF pens are sold in the retail market and the evi-

---

2. Lindy argues that actual confusion must be inferred from evidence that sales of 460–F pens *diminished* after Bic marketed its PF pen. The district court found that the decreasing sales of 460–F pens were consistent with the overall decline in Lindy's business. This finding is amply supported by evidence in the record. One of Lindy's witnesses, a wholesaler, indicated that his company had dropped the entire Lindy line in response to Lindy's difficulty in meeting orders. Lindy's president testified to a number of conditions causing Lindy serious commercial difficulties during the 1970's. Ultimately, Lindy sold its assets to Blackfeet Plastics, Inc. in 1981.

3. Lindy argues that the decline in sales of its 460–F pen, *see supra* note 2, is additional evidence of its sales to the commercial trade prior to Bic's marketing of the PF pen. We disagree. Lindy presented no evidence indicating the percentage of the dimunition in 460–F sales attributable to commercial accounts, and its own witnesses testified to conditions that would account for substantial reduction in sales of Lindy pens in the retail market.

dence in the record indicating that some Lindy 460–F pens have been sold in the commercial market, we conclude that the parties sell pens in convergent marketing channels. *See AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 353 (9th Cir.1979). Convergent marketing channels increase the likelihood of confusion. *Id.*

### 2. Similarity of The Marks.

■ Overwhelming evidence at trial established that the Lindy and Bic pens and all packaging, display and promotional materials were dissimilar in appearance and readily distinguishable. The trial court further found that the trademarks "BIC" and "LINDY" were prominently and repeatedly displayed on the pens and all packaging and promotional materials. The trial court therefore concluded that the two marks, Lindy's "Auditor's" and Bic's "Auditor's fine point," considered in the context in which they appeared in the marketplace, were not confusingly similar.

Lindy argues that the district court erred in determining whether the marks were confusingly similar without first finding as a threshold matter that the two marks were almost identical. Lindy insists that the court, thus, collapsed the inquiry as to similarity of the marks into the ultimate legal conclusion whether defendant's mark creates a likelihood of confusion. *See AMF, Inc. v. Sleekcraft Boats,* 599 F.2d at 350. Although Lindy is correct that it is improper to equate the two inquiries, *see id.,* we read the district court's opinion to reflect the appropriate examination of the marks' similarity. The two marks viewed in isolation are indeed identical, but their similari-

ty must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the pens. *Alpha Industries v. Alpha Steel Tube & Shapes,* 616 F.2d at 444; *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d at 351; *Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 759 (9th Cir.1978), *cert. denied sub nom. O'Neill v. Walt Disney Productions,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *see Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 967 (2d Cir.1981).

We have thoroughly examined numerous exhibits reflecting the appearance of the pens, their packaging, and their promotional materials. The pens' dissimilar appearance, the dominance of the company marks and logos on the pens themselves and on all packaging and promotional material, and the dissimilar and distinctive packaging and advertisement designs overcome the similarity of the marks considered in isolation. Insofar as the marks are encountered in a marketplace permitting visual examination of the pens themselves or their packaging or promotional material, the district court correctly found that the marks are readily distinguishable in the context in which they are encountered.[4]

We agree with Lindy, however, that a different conclusion probably follows with respect to the telephone solicitation marketplace. Where prospective purchasers typically have little opportunity to see the product or promotional material, the dissimilarities in appearance have no ameliorating effect. The district court made no findings expressly concerning telephone sales of the PF and 460–F pens.[5] Evidence in the

---

4. In *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 351 (9th Cir.1979), we noted that the use of a house mark and distinctive logo could reduce the likelihood of confusion, but concluded that the effect was negligible where the house mark was inconspicuous and the logo often absent. Here, by contrast, the marks are always accompanied by prominent house marks and logos, compared to which the marks are themselves inconspicuous.

5. From the evidence presented at trial on the operation of the various marketing channels, it appears that retail outlets order pens directly

from manufacturers or through wholesalers, referring to the pens' manufacturer, model number and ink color, and then typically sell the pens from displays supplied by the manufacturer. Mail order and telephone marketing outlets order pens directly from the manufacturer, also by model number and color. Mail order outlets send flyers or envelope stuffers to prospective customers or place ads with order blanks in publications. The flyers or ads offer the pens in bulk at a substantial discount from list price. Telephone outlets call prospective customers

record indicates, however, that Bic sold a substantial number of PF pens for resale in the telephone solicitation market and that Lindy sold at least some pens to that market. Evidence further indicates that some consumers may have ordered pens from telephone sales outlets by the designation "Auditor's" rather than by brand, model number or point size.[6] On the basis of the record before us, we conclude that the finding that the marks were not confusingly similar is clearly erroneous with respect to the telephone solicitation marketplace. Some of the testimony given at trial appears to reflect a practice of telephone sales in the retail trade. Because the district court's findings do not address telephone sales in any detail, we are unable to determine whether retail telephone sales are common or whether retail telephone customers have the opportunity to view the. pens or promotional material. The district court should make these determinations on remand.

### B. Legal Standard for Likelihood of Confusion.

■ Lindy challenges the district court's legal standard for determining likelihood of confusion as unduly narrow. The court required Lindy to demonstrate a likelihood of confusion or deception "as to the origin of the goods." We agree with Lindy that the test for likelihood of confusion in this circuit is broader, embracing confusion as to the association between the goods or sponsorship of the allegedly infringing goods. *See Shakey's Inc. v. Covalt,* 704 F.2d at 431; *Carson Manufacturing Co. v. Carsonite International Corp.,* 686 F.2d at 670; *Golden Door, Inc. v. Odisho,* 646 F.2d at 349; *Alpha Industries v. Alpha Steel Tube & Shapes,* 616 F.2d at 443.

We conclude, however, that Lindy's claim that Bic's use of the mark "Auditor's" creates a likelihood of confusion as to Lindy's sponsorship of, or association with, Bic's PF pens must nonetheless fail. The district court held that Lindy had not shown that its mark "Auditor's" had acquired secondary meaning. Secondary meaning is a question of fact. *See Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 821 (9th Cir.1980). The district court's finding that "Auditor's" did not have secondary meaning is not clearly erroneous. *See Faberge, Inc. v. Saxony Products, Inc.,* 605 F.2d 426, 428 (9th Cir.1979). Lindy's mark is weak. In the absence of secondary meaning, we do not see how Lindy could prevail on its sponsorship confusion claim. *See HMH Publishing Co. v. Brincat,* 504 F.2d 713, 718–19 (9th Cir.1974).[7]

### C. Necessity for Remand.

■ We affirm the district court's findings that Lindy's mark is weak and without secondary meaning, that there is no evidence of actual confusion, that Bic adopted the designation "Auditor's fine point" without intent to capitalize on Lindy's goodwill, and that purchasers tend to use such ordinary caution as is reasonable with respect to inexpensive, disposable goods. We also affirm the district court's finding that in the context of retail over-the-counter and mail order sales, the marks as encountered in the marketplace are dissimilar. We reverse the district court's finding that Bic and Lindy do not sell the PF and 460–F pens in the same channel of trade, and reverse the finding that the marks are dissimilar insofar as it applies to the telephone sales marketplace.

We now turn to the district court's conclusion that Bic's use of the word "Audi-

---

and offer them pens and other office supplies in bulk at similar discounts.

**6.** Mr. Linden also testified that some of Lindy's accounts ordered pens by the name "Auditor's." Because these orders were placed directly with the pen's manufacturer, we do not believe that the practice, standing alone, supports a conclusion of likelihood of confusion with respect to purchases for resale. Our con-

cern is with the likelihood of confusion attending consumer's purchases from these accounts.

**7.** Lindy's only evidence on this aspect of its claim was the speculative testimony of one of its customers that had she seen a Bic PF pen prior to learning of Lindy's lawsuit she might have assumed that Bic and Lindy had merged.

tor's" on its PF pens creates no likelihood of confusion. On the basis of the record before us, we have no difficulty affirming the district court's conclusion that Lindy has failed to show a likelihood of confusion with respect to retail over-the-counter sales, mail order sales and sales by the manufacturer to intermediaries. Our examination of the record persuades us, however, that Lindy has probably established likelihood of confusion with respect to the telephone sales market. Because the district court failed to make detailed factual findings with respect to that particular market, we prefer to vacate that portion of the district court's opinion and remand for further proceedings. We find it difficult, on the record before us, to determine the extent to which Lindy sold 460-F pens to the commercial telephone sales trade during the relevant time periods, or the extent to which telephone sales occur in the retail trade. It is the district court who heard the testimony and assessed the credibility of the witnesses. Moreover, the district court has the benefit of a more complete record than that before us on appeal. We emphasize that it is Lindy who bears the burden of proof. *Golden Door, Inc. v. Odisho,* 646 F.2d at 349. On remand, the district court should make additional findings of fact with respect to the telephone sales market or markets, and proceed to make a new determination of the similarity of the marks as they are encountered in the telephone sales marketplace before determining whether Lindy has established a likelihood of confusion.

### D. Incontestability and Fair Use.

▮ The district court found that Lindy's mark had become incontestable under the provisions of 15 U.S.C. § 1065 (1976). Lindy argued below that the incontestability of its mark, without more, entitled it to prevail on its infringement claim under the provisions of 15 U.S.C. § 1115(b) (1976).[8] Assuming, without deciding, that incontestability entitled Lindy to prevail in the absence of a showing of likelihood of confusion, the district court ruled that Bic had established a statutory enumerated defense to a claim of infringement of an incontestable mark, in that Bic's use of the word "Auditor's" was "a use, otherwise than as a trade or service mark ... of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods and services of such party...." 15 U.S.C. § 1115(b)(4) (1976). Lindy renews on appeal its argument that the incontestable status of its mark entitles it to an injunction in order to preserve its exclusive right to use its mark on ballpoint pens. The law of this circuit is otherwise. Incontestability of a mark may protect the registrant's mark from cancellation, but is of no offensive use. *Prudential Insurance Co. v. Gibraltar Financial Corp.,* 694 F.2d 1150, 1153 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3538, 77 L.Ed.2d 1389 (1983); *see Tillamook County Creamery Association v. Tillamook Cheese and Dairy Association,* 345 F.2d 158, 163 (9th Cir.), *cert. denied,* 382 U.S. 903, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965). There can be no liability for trademark infringement, even where a mark has attained incontestable status, in the absence of likelihood of confusion. *See Prudential Insurance Co. v. Gibraltar Financial Corp.,* 694 F.2d at 1153.

---

**8.** 15 U.S.C. § 1115(b) (1976) provides, in pertinent part:

    (b) If the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein except when one of the following defenses or defects is established:

.  .  .  .  .

    (4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin....

■ Relying on the district court's ruling on the so-called fair use defense, however, Bic invokes its fair use of Lindy's mark to immunize it from liability for infringement even where likelihood of confusion has been shown. This court has never adopted so broad an interpretation of the fair use defense, and we decline to do so here. We have recognized that liability for infringement may not be imposed for using a registered trademark in connection with truthful comparative advertising. *See SSP Agricultural Equipment, Inc. v. Orchard-Rite Ltd.*, 592 F.2d 1096, 1103 (9th Cir.1979); *Saxony Products, Inc. v. Guerlain, Inc.*, 513 F.2d 716, 722 (9th Cir.1975); *Smith v. Chanel*, 402 F.2d 562, 563 (9th Cir.1968). The use Bic is making of the mark "Auditor's" is not such a use. Nor is Bic using the word merely to describe the size of its PF pen's ballpoint.[9] We conclude that Bic is making a trademark use of the word "Auditor's," and is not immune from liability for infringement on the basis of the fair use defense. To the extent that the district court's ruling on this issue may be deemed applicable to Lindy's claim for infringement based on a likelihood of confusion, we reverse that ruling.[10]

## II. Breach of Contract.

■ Lindy asserted, as an alternate theory for recovery, a purported settlement agreement comprising correspondence between Bic's and Lindy's attorneys. In 1965, prior to obtaining federal trademark registration, Lindy discovered that Bic was selling ballpoint pens with "auditor's extra fine point" stamped on their barrels. Lindy wrote to Bic demanding that it cease using the word "Auditor's".[11] Bic referred the letter to outside counsel. In the ensuing exchange of letters, Bic maintained that its use of the word was merely descriptive of a type of pen and Lindy insisted that it owned the exclusive right to use "Auditor's" in connection with pens. Ultimately, Bic agreed to replace the word "Auditor's" with another descriptive word once it had exhausted its inventory. Subsequently, Lindy noticed two retail advertisements for Bic pens that included the word "Auditor's" and wrote to Bic to complain. Bic responded that the retail advertisers had apparently used the word on their own initiatives and without Bic's authorization. The district court examined the correspondence and determined that it did not constitute a settlement agreement and that the record was otherwise devoid of any evidence of a binding agreement precluding Bic from using the word "Auditor's." We will uphold this finding unless it is clearly erroneous. *See Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir.1982). We have examined the correspondence, and found nothing therein manifesting Bic's concession of any binding limitations on its use of "Auditor's." The parties' conduct during the period of the

9. Bic conceded that it uses the word "Auditor's" to distinguish its PF pen from other Bic pens with the same size ballpoint.

10. Because of our disposition of this issue, we need not reach Lindy's argument that Bic is not entitled to assert the defense because its use of the word "Auditor's" is intended to deceive consumers by indicating that the PF pen has an extra-fine point.

11. The district court found that Lindy had been vigilant in policing its mark. The record supports this finding. According to Lindy's president, Sydney Linden, the company's policy has been to claim trademark rights and obtain trademark registration for all names used in connection with its pens. Lindy holds federal trademark registrations for "Utility," "Legal Copy," "2'n'1," "Short-shorty," and "Utracta-pen," and has claimed proprietary trademark rights in "Steno" pen, "Reverse-A-Point" pen, "Exec-Sec" pen, "Fast-Riter" pen and "Clear" pen. Lindy has diligently policed its claimed rights by requesting other manufacturers to cease using words that Lindy has adopted as trademarks. The record indicates that various competitors acceded to Lindy's requests. Between 1965 and 1969, Lindy wrote letters asserting its exclusive rights to the use of the word "Auditor's" in connection with the sale of ballpoint pens to Bic, Scripto, Eversharp Pen Company and Lee Specialty Company. All four companies disputed Lindy's claims but agreed to cease using the word "Auditor's." Two other businesses agreed to refrain from using "Auditor's" after Lindy filed lawsuits against them. In 1977 and 1978, Lindy persuaded the Major Line Company and the Richard Best Company to cease imprinting "Auditor's" on ballpoint pens.

purported agreement manifests no such concession. We affirm the district court's finding that Bic and Lindy did not enter into a settlement agreement precluding Bic from using Lindy's mark.

## CONCLUSION

We affirm the district court's conclusion that there is no likelihood of confusion and, hence, no liability for infringement, with respect to Bic's use of the mark "Auditor's" in the mail order and over-the-counter retail sales markets. We reverse the district court's conclusion that there is no likelihood of confusion in the telephone sales market or markets, and remand the trademark infringement claim for further proceedings with respect to telephone sales. We affirm the judgment of the district court on Lindy's other claims.

AFFIRMED in part, REVERSED in part and REMANDED.