**MDT CORPORATION, Plaintiff,**

v.

**NEW YORK STOCK EXCHANGE, INC., Defendant,**

**Medtronic, Inc., Intervenor.**

**No. CV 93–1103 MRP.**

United States District Court, C.D. California.

April 15, 1994.

---

**2.** In fact, plaintiff asks for summary judgment in     his favor.

Bart L. Kessel, Arter & Hadden, Los Angeles, CA, David V. Trask, H. Dickson Burton, Allen C. Turner, Trask, Britt & Rossa, Salt Lake City, UT, for plaintiff.

Kent R. Raygor, Janet R. Rich, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, Joseph D. Garon, Bradley B. Geist, Stephen J. Quigley, Brumbaugh, Graves, Donohue & Raymond, New York City, for defendant.

Louis T. Pirkey, William G. Barber, Shannon T. Vale, Arnold, White & Durkee, Austin, TX, Gary A. Hamblet, Randi S. Lewis, Breidenbach, Swainston & Way, Los Angeles, CA, for intervenor Medtronic, Inc.

## AMENDED STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

PFAELZER, District Judge.

Plaintiff MDT Corporation's ("MDT Corp.") Motion for Summary Judgment Enjoining Defendant's Further Use of MDT as a Trading Symbol for Medtronic Inc., Plaintiff MDT Corp's Motion for Summary Judgment, Dismissal of Intervenor's Complaint, Defendant New York Stock Exchange, Inc.'s ("NYSE") Motion for Summary Judgment and Intervenor Medtronic Inc.'s ("Medtronic") Motion for Summary Judgment came on for hearing on March 24, 1994. After considering the papers filed by the parties and the arguments of counsel, the Court determines that the following uncontroverted facts and conclusions of law have been established.

### UNCONTROVERTED FACTS

1. Trading symbols are used within the securities business to identify a specific publicly traded security; in particular trading symbols play an important role in the techni-

cal execution of trading transactions on the floor of the NYSE.

2. Medtronic was founded in 1949. It manufactures and sells a variety of medical products, including cardiac pacemakers, artificial heart valves, cardiopulmonary products and interventional vascular products.

3. Since the early 1960s, Medtronic's securities have been publicly traded. At first they were traded over the counter. Then, beginning on February 5, 1971, Medtronic's securities were traded on NASDAQ under the trading symbol MDTR.

4. On November 21, 1977 Medtronic began the listing of its stock on the NYSE and its listing has remained there until the present time. Since they were first listed on the NYSE, Medtronic's securities have been identified by the trading symbol MDT.

5. All stocks listed on the NYSE are assigned a unique trading symbol which must comprise three or fewer letters.

6. When a company is accepted for listing on the NYSE, it is asked to submit three alternative choices for a three letter trading symbol. If the requested symbol is available, the NYSE assigns it to the listing company. A trading symbol is not available if it is already in use by a listing company on either the NYSE or a number of other regional exchanges. Approximately two-thirds of the first choices for NYSE trading symbols are not available because they are already in use. The sole criterion used by the NYSE in assigning a trading symbol and the only ground on which a trading symbol will be denied is the availability of a symbol.

7. Because NYSE trading symbols may include no more than three characters, Medtronic was required to change its trading symbol when it moved its listing to the NYSE.

8. The parties do not dispute that Medtronic's motive for choosing the MDT trading symbol was to obtain a trading symbol as close as possible to its former NASDAQ trading symbol. The parties also do not dispute that the assignment of the MDT trading symbol to Medtronic was made in good faith, without any intent by either Med-

tronic or the NYSE to violate any trademark or trade name held by MDT Corp.

9. MDT Corp. was founded on July 1, 1971. MDT Corp. manufactures and sells medical devices such as sterilization equipment and tools used by doctors and dentists.

10. The term MDT was first used as a trade name by MDT Corp. in 1971. The term MDT as used by MDT Corp. was originally derived from the phrase "Medical Dental Technology."

11. MDT Corp. holds a variety of registered trademarks for stylized versions of the MDT character combination, most of which include a medical cross through the central D.

12. On July 1, 1988, MDT Corp. applied to list its publicly traded securities on the New York Stock Exchange and on August 5, 1988, the NYSE accepted MDT Corp.'s securities for listing. At that time, the NYSE informed MDT Corp. that its first choice for a trading symbol was not available because it was already being used to identify the stock of Medtronic.

13. Starting in February of 1989, MDT Corp. began attempts to convince Medtronic to change its NYSE trading symbol. Medtronic never agreed to MDT Corp.'s demands, and since March 1989 has consistently and repeatedly expressed to MDT Corp. that it was unwilling to relinquish the MDT trading symbol. Similarly, since 1988, NYSE has consistently and repeatedly expressed to MDT Corp. that it would not change Medtronic's MDT trading symbol without Medtronic's consent.

14. In November 1977, when the MDT trading symbol was assigned to Medtronic by the NYSE, MDT Corp. was not publicly traded and was little known in the public securities industry.

15. MDT Corp. did not go public until January 1987 when it listed its securities on NASDAQ under the trading symbol MDTC. That was ten years after the MDT trading symbol was assigned to Medtronic by the NYSE.

16. Until January 1987, MDT Corp. shares were never publicly traded, there

were no publicly available reports from brokerage or investment firms concerning trading in MDT Corp. shares, there were no third party listings or brokerage reports of trades of MDT Corp. shares, no trading symbol existed to identify MDT Corp. shares, and MDT Corp. did not participate as an issuer in the market for publicly traded securities.

17. Although MDT Corp. is the senior user of the MDT mark in the medical products field, Medtronic, not MDT Corp., is the senior user of the MDT mark within the context of the publicly traded securities market.

18. MDT Corp. knew about Medtronic's use of the MDT trading symbol to identify its stock on the NYSE as of at least 1982 when MDT Corp. director John Shamy informed MDT Corp.'s president Miles Branagan about Medtronic's use of the MDT trading symbol at an MDT Corp. Board of Directors meeting.

19. MDT Corp. did not file suit against the NYSE or Medtronic until eleven years after MDT Corp. first knew about the NYSE and Medtronic's use of the MDT trading symbol and four years after it first threatened Medtronic with litigation regarding the MDT trading symbol.

20. During MDT Corp.'s eleven year delay in filing suit following its actual knowledge of Medtronic's use of the MDT trading symbol, the use of the symbol to identify Medtronic's securities became more widely known in the securities industry.

21. MDT Corp. concedes that Medtronic and the NYSE use the MDT trading symbol only to identify Medtronic's securities.

22. MDT Corp. concedes that the NYSE and Medtronic's use of the MDT trading symbol to identify Medtronic's securities does not infringe or dilute its trade name.

23. Several financial and stock analysts' reports have been produced which contain certain passages in which Medtronic was referred to as MDT. Neither Medtronic nor the NYSE was in any way involved in the production of those reports.

24. The only theory of trade name infringement alleged to have been committed by the NYSE or Medtronic is that they failed to police potentially infringing third party use of the MDT trading symbol in documents like financial reports where the MDT trading symbol has been used to identify Medtronic.

25. Throughout the country, there are numerous unrelated third-party uses of MDT as either trademarks or trade names for a variety of companies producing a wide array of goods and services.

26. MDT Corp. is no longer pursuing its claim under the New York antidilution statute.

27. Medtronic moved to intervene in this action on June 2, 1993 pursuant to both Rule 24(a) of the Federal Rules of Civil Procedure (intervention as of right) and Rule 24(b) of the Federal Rules of Civil Procedure (permissive intervention).

28. The original parties, MDT Corp. and NYSE, stipulated to allow Medtronic to intervene on June 15, 1993. The Court approved the stipulation on the following day. The Court's order stated that "Medtronic is made a party to this action in the same manner and with like effect as if named as an original party to this action."

## CONCLUSIONS OF LAW

1. The Ninth Circuit interprets the question of likelihood of confusion as a mixed question of fact and law. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir.1985). Summary judgment is disfavored in trademark cases because the ultimate issue is so inherently factual. *Id.* at 1356 n. 5. However, "[d]espite a decided judicial preference not to dispose of trademark disputes through Rule 56 proceedings, summary judgment should be granted where the party opposing the motion fails to demonstrate the existence of any material issues of fact for trial." *Sykes Laboratory, Inc. v. Kalvin*, 610 F.Supp. 849, 860 (C.D.Cal.1985).

2. It is well established that, unlike a patent or copyright, a trademark does not confer on its owner any right in gross or at large. *Treager v. Gordon–Allen, Ltd.*, 71 F.2d 766, 768 (9th Cir.1934). Rather, all a

trademark does is "so to identify the 'owner' that its use by others can be said to divert to them customers who might otherwise have bought of him." *Durable Toy & Novelty Corp. v. J. Chein Co.*, 133 F.2d 853 (2d Cir.1943) (L. Hand, J.), *cert. denied,* 320 U.S. 211, 63 S.Ct. 1447, 87 L.Ed. 1849 (1943). Consequently, the owner of a mark acquires the right to prevent the goods to which the mark is applied from being confused with those of others and to prevent his own trade from being converted to competitors through their use of misleading marks. *Lucasfilm Ltd. v. High Frontier,* 622 F.Supp. 931 (D.D.C.1985). In other words, the essence of the trademark right is the identification of the source of a product, service or a business. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 4.04[10] (3d Ed.1992).

■ 3. The strength of a trademark or trade name is largely determined by its position on a continuum stretching from arbitrary marks to suggestive marks. Arbitrary and fanciful marks are strong, while suggestive and descriptive marks are weak. *Accuride Int'l v. Accuride Corp.,* 871 F.2d 1531, 1536 (9th Cir.1989).

■ 4. Because MDT Corp.'s mark is a combination of letters of the alphabet that is derived from the term "Medical Dental Technology" and because the combination "MD", which makes up a substantial part of the MDT mark, strongly suggests the medical field, MDT Corp.'s mark is, at best, suggestive.

■ 5. A descriptive or suggestive mark may be strengthened by such factors as extensive advertising, length of exclusive use, public recognition and uniqueness. *Accuride Int'l v. Accuride Corp.,* 871 F.2d 1531, 1536 (9th Cir.1989). Although MDT Corp. has presented some evidence of extensive advertising in the medical device field, the NYSE and Medtronic's priority and long-standing concurrent use of the mark in the securities field compels the conclusion that MDT Corp.'s mark is quite weak in the context of the securities market. *See Accuride,* 871 F.2d at 1536 ("AII's advertising and sales are insufficient to convert "Accuride" into a strong mark/name because of the parties concurrent use of that mark as a trademark.").

■ 6. Laches is a question of law and may be determined on summary judgment. *American Int'l Group v. American Int'l Bank,* 926 F.2d 829 (9th Cir.1991). In the trademark context, the existence of laches is determined by a six part test: (1) the strength and value of the trademark rights asserted; (2) the senior user's diligence in enforcing the mark; (3) the harm to the senior user if relief is denied; (4) whether the junior user acted in good faith ignorance of the senior's rights; (5) the degree of competition between the senior and junior users; and (6) the extent of harm suffered by the junior user because of the senior user's delay in asserting its rights. *E-Systems, Inc. v. Monitek, Inc.,* 720 F.2d 604 (9th Cir.1983). The central purpose of the doctrine of laches in the trademark field is to discourage a trademark holder from waiting to bring suit until the junior user has begun to establish secondary meaning in its mark. "The owner's rights in such appendant markets are easily lost, lest they be made the means of reaping a harvest which others have sown." *Physicians Formula Cosmetics v. West Cabot Cosmetics, Inc.,* 857 F.2d 80, 82 n. 1 (2d Cir.1988).

■ 7. Contributory trademark infringement occurs under § 32 of the Lanham Act "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one who it knows or has reason to know is engaging in trademark infringement." *Inwood Laboratories, Inc. v. Ives Laboratories Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). The doctrine of *Inwood Laboratories* requires that, to be liable for contributory infringement, a party must have actively "suggested, even if only by implication" the infringement. *Inwood Laboratories,* 456 U.S. at 860, 102 S.Ct. at 2191 (White, J. concurring). MDT Corp. has not argued, and indeed cannot argue, that either Medtronic or the NYSE has in any way suggested, or even implied, that anyone should use MDT the trading symbol as anything but a trading symbol. Instead, MDT Corp. ap-

pears to interpret *Inwood Laboratories* to impose an *affirmative duty* on innocent third party users of a mark to police the mark for its owner. No such duty exists.

MDT Corp. contends that by continuing their admittedly innocent use of the MDT trading symbol after being informed that third parties in the securities field were using the trading symbol as a trade name for Medtronic, Medtronic and the NYSE became liable for contributory infringement. Mere continuation of a non-infringing use does not violate either prong of the *Inwood Laboratories* test. Even if the contributory infringement doctrine established by *Inwood Laboratories* extends to actions brought under § 43(a) of the Lanham Act, it does not extend so far as to require non-infringing users to police the mark for a trade name owner. The owner of a trade name must do its own police work.

■ 8. Even if the failure of an innocent user of a mark to police third party use of the mark on behalf of the trademark holder could potentially amount to contributory infringement, the NYSE's failure to police MDT Corp.'s mark would not be actionable because MDT Corp. is guilty of laches. MDT Corp. acquiesced in the NYSE and Medtronic's continuous use of the MDT trading symbol for at least twelve years. It cannot now enjoin that use solely because the trading symbol has now begun to acquire some secondary meaning on behalf of Medtronic.

■ 9. The Court can resolve MDT Corp.'s trademark claims on summary judgment because the resolution of these claims does not require an inquiry into the likelihood of confusion. First, Medtronic and the NYSE are the senior users of the MDT mark within the publicly traded securities market and at the time they began that use, MDT Corp.'s trade name was quite weak in that market. Second, by waiting at least twelve years to challenge the NYSE and Medtronic's use of the MDT trading symbol MDT Corp. lost, on account of laches, any right it might once have had to enjoin that use. Third, MDT Corp. has conceded that neither Medtronic nor the NYSE has directly infringed its trade name and MDT Corp.'s theory of contributory infringement does not state a claim for which relief can be granted.

■ 10. To prevail under California Business & Professions Code § 14330, a plaintiff must show that its business reputation is likely to be injured, or that the distinctive value of its mark is likely to be diluted. *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir.1991).

11. Injury to business reputation arises where the plaintiff's mark or name is tarnished or degraded through association with something unsavory such as illicit drugs or pornography. *Accuride*, 871 F.2d at 1538. MDT Corp. does not allege any such tarnishment.

12. Section 14330 only protects strong, well-recognized marks against dilution. *Accuride*, 871 F.2d at 1539; *Sykes Laboratory, Inc. v. Kalvin*, 610 F.Supp. 849, 858 (C.D.Cal. 1985) ("The dilution doctrine is only available to protect distinctive marks as exemplified by such famous names as 'Tiffany', 'Polaroid', 'Rolls Royce', and 'Kodak'.").

■ 13. Because MDT's mark is not strong outside of the medical device field and because the mark has been used concurrently with the MDT trading symbol for approximately seventeen years, MDT Corp. cannot prevail on a dilution theory under California Business & Professions Code § 14330. *Accuride*, 871 F.2d at 1539 (upholding a district court's finding of no dilution because the parties' concurrent use of the mark for twenty-five years effectively precluded a finding that the value of the plaintiffs' trade name could be diluted).

■ 14. Stipulations are valuable tools for the promotion of judicial economy. *United States v. McGregor*, 529 F.2d 928 (9th Cir.1976). Once a stipulation is made, it should generally be enforced absent circumstances tending to negate a finding of voluntary and informed assent of a party to the agreement. *Id.* Likewise, once a party has stipulated to a fact or an issue, that party may be equitably estopped from contesting the issue. *Mangaroo v. Nelson*, 864 F.2d 1202, 1204–06 (5th Cir.1989). In *Mangaroo*,

the Fifth Circuit evaluated the issue of equitable estoppel on the basis of four factors: (1) that the party to be estopped was aware of the facts; (2) that the party to be estopped intended its act or omission to be acted upon; (3) that the party asserting estoppel did not have knowledge of the facts; and (4) that the party asserting estoppel reasonably relied on the conduct of the other to its substantial injury.

■ Medtronic unquestionably satisfies all four *Mangaroo* requirements. MDT Corp. is a sophisticated litigant and should be held to understand the effect of its stipulations. MDT Corp. clearly intended that its stipulation to allow Medtronic to intervene would result in the active participation of Medtronic in the action. Medtronic cannot be held to have known that MDT Corp. would attempt to challenge its intervention only after Medtronic had expended considerable time and money litigating the action, and Medtronic has acted to its detriment in reliance on the stipulation that it would be made full participant in the action. Therefore, MDT Corp. is estopped from challenging Medtronic's intervention at this late date.

■ 15. Federal Rule of Civil Procedure 54(d) requires that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." An intervenor is considered a prevailing party for the purposes of an award of costs so long as the intervenor's position actually prevails and the intervenor substantially contributed to the resolution of the issues presented by the matter. *Smith v. Board of School Commissioners of Mobile County,* 119 F.R.D. 440 (S.D.Ala.1988); *see also Delta Air Lines v. Civil Aeronautics Board,* 505 F.2d 386 (D.C.Cir.1974) (In interpreting Rule 39(a) of the Federal Rules of Appellate Procedure, the court stated that "of those circuits confronting the problem, the prevailing practice has been to treat intervenors in agency actions like any other prevailing or losing party, as the case may be."). Because Medtronic is a prevailing party within the meaning of Rule 54(d) of the Federal Rules of Civil Procedure and because Medtronic substantially contributed to the resolution of this

action, Medtronic is entitled to its costs in this action.

16. This amended Statement of Uncontroverted Facts and Conclusions of Law shall be effective nunc pro tunc as of the date of the Court's original Statement of Uncontroverted Facts and Conclusions of Law on March 30, 1994.