THIS OPINION
IS A PRECEDENT OF THE
T.T.A.B.

Mailed:
June 30, 2008
jtw

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## Trademark Trial and Appeal Board

_____

Grand Canyon West Ranch, LLC
v.
Hualapai Tribe

_____

Opposition No. 91162008
to Application Serial No. 76484111
filed on 1/23/2003

_____

Eric R. Olsen and Joel Z. Schwarz of Gordon & Silver, Ltd. for Grand Canyon West Ranch, LLC.

Michael F. Campillo and Joseph R. Meaney of Venable, Campillo, Logan & Meaney, P.C. for the Hualapai Tribe.

_____

Before Walsh, Mermelstein and Wellington, Administrative Trademark Judges.

Opinion by Walsh, Administrative Trademark Judge:

Grand Canyon West Ranch, LLC (opposer) has opposed the application of the Hualapai Tribe (applicant) to register the mark GRAND CANYON WEST in standard characters for services now identified as: "airport services; air transportation services; arranging for recreational travel tours and providing related transportation of passengers by air, boat, raft, bus, and motorized on-road and off-road vehicles." The Board ordered entry of this identification

of services in an interlocutory decision in this case, a decision we will discuss below. *See Grand Canyon West Ranch LLC v. Hualapai Tribe*, 78 USPQ2d 1696 (TTAB 2006).

The GRAND CANYON WEST application is based on applicant's claim that the mark was first used in commerce on February 14, 1988, under Trademark Act Section 1(a), 15 U.S.C. § 1051(a), and applicant's claim that the mark has acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f).

The Grounds

As grounds for the opposition, opposer asserts that applicant committed fraud "… by falsely stating that it had used the GRAND CANYON WEST mark in connection with services that neither it nor its licensee has provided" and that applicant's mark "… consists of matter which, when applied to applicant's services, is merely descriptive of Applicant's services in violation of 15 U.S.C. §1052(e), and has not acquired distinctiveness or secondary meaning within the meaning of 15 U.S.C. §1052(f)."  First Amended Notice of Opposition at 4.  Applicant has denied the essential allegations of the first amended notice of opposition.

The Record

The record consists of the pleadings and the record related to the opposed GRAND CANYON WEST application, as well as witness testimony and notices of reliance filed by

2

applicant, and notices of reliance filed by opposer. Applicant's five witnesses are all either persons hired by applicant to manage its enterprise or tour operators which provided services under agreements with applicant. None of applicant's "principals" testified. Neither party has maintained objections to any evidence.

## Standing

Opposer has standing to bring this proceeding. Opposer asserts that it is using and that it has filed applications to register the GRAND CANYON WEST RANCH mark, and applicant's witnesses confirm opposer's use of GRAND CANYON WEST RANCH. See, e.g., Testimony of Allison Raskansky (Raskansky) at 54. Thus, the registration of applicant's mark could impact opposer's ability to register or to continue to use GRAND CANYON WEST RANCH. Therefore, opposer has established a real interest in this proceeding. *See generally Jewelers Vigilance Committee Inc. v. Ullenberg Corp.*, 823 F.2d 490, 2 USPQ2d 2021, 2023 (Fed. Cir. 1987).

## Findings of Fact

Applicant owns a large expanse of land on the west rim of the Grand Canyon. The area identified as the "west rim" extends for 100 to 110 miles east from the point where the Colorado River meets Lake Meade. Testimony of Earl Jobson (Jobson) at 15. In 1986, applicant developed a plan to establish a tourist destination at a specific site within

its property.  Applicant's plans focused on bringing tourists from Las Vegas and other places to applicant's "destination" to experience the Grand Canyon from a pristine perspective and to experience Hualapai culture.  Testimony of Judith Strand (Strand) at 14-16.  The site applicant selected and eventually developed is about 115 miles east of Las Vegas.  Jobson at 15.

When applicant first implemented its plan in 1988, applicant began to offer tours and other related services at the selected destination or site on the western rim of the Grand Canyon within applicant's property.  Strand at 18-19.

One of the chief features of the plan was the opening of an air strip to provide air access to the destination, and eventually, helicopter flights from the site into the canyon.  The airstrip was completed in 1988 and Applicant began bringing visitors to the site by both air and van on February 14, 1988, a total of six visitors by van and seven by airplane.  *Id.*  On that date, applicant identified the air strip and the destination or site as GRAND CANYON WEST, and applicant began to use the GRAND CANYON WEST mark to identify the source of the services applicant offered at this "destination."  *Id.* at 25.  Initially, applicant provided guided tours at GRAND CANYON WEST directed by members of the Hualapai Tribe.  Shortly thereafter applicant offered additional services, such as an Arizona-style

4

barbeque.  Also, shortly after opening, applicant began to use school buses to transport visitors during their tours of the site.  *Id.* at 43.

There is no evidence that prior to applicant's adoption of the GRAND CANYON WEST mark anyone else had used GRAND CANYON WEST either to identify this particular destination or site or for any other purpose.

Applicant implemented its plan to establish GRAND CANYON WEST as a tourist destination by enlisting tour operators and others to provide transportation to the destination.  From the outset, applicant has controlled access to the site, among other means, by charging a fee for each visitor to the site.  *Id.* at 57.

The number of tour operators servicing the site and the number of visitors to GRAND CANYON WEST increased steadily from the opening to the present.  From the thirteen visitors on the first day of operations in 1988, the numbers of visitors grew to between 60 and 100 per day in three years. *Id.* at 57.  By 1993, at least ten tour operators were bringing visitors to GRAND CANYON WEST.  *Id.* at 69.  At this time, one tour operator alone ran six to nine buses to the site each day, each carrying between 40 to 50 visitors.  *Id.* at 69-70.  By 1994, one tour operator was bringing approximately 300 visitors per day to GRAND CANYON WEST by airplane.  Raskansky at 10-11.  Helicopters began to land at

GRAND CANYON WEST by 1995-96; these helicopters carried visitors from the top of the canyon at GRAND CANYON WEST to the canyon floor and the Colorado River. *Id.* at 19-20. In recent years the numbers of visitors to GRAND CANYON WEST have increased dramatically: 220,209 in 2003, 269,427 in 2004, 299,000 in 2005 and 334,874 in 2006. *Id.* at 67-69.

Applicant marketed its services through Las Vegas tour operators and hotels, as well as directly to groups outside the United States in countries including England, Korea, Japan and China. Strand at 20-22. In the early 1990s, applicant distributed between 60,000 and 100,000 "rack cards" each year through one tour operator to advertise tours to GRAND CANYON WEST. *Id*. at 24. Applicant also operates a web site to promote its services under the GRAND CANYON WEST mark. Raskansky at 60-61.

More recently, applicant developed a "Skywalk" which opened in March 2007. The Skywalk is a bridge-like structure with a see-through glass deck and glass railings/walls which extends for 70 feet over the canyon from the canyon wall. The Skywalk provides a view over the Grand Canyon to the floor 4,000 feet below which is both dramatic and unique. The opening of the Skywalk resulted in significant coverage of GRAND CANYON WEST in the media. Stories about the Skywalk and about applicant's activities more generally referring to GRAND CANYON WEST have appeared

6

in numerous publications including *The Arizona Republic*, *The Las Vegas Sun*, *The Detroit Free Press*, *The Chicago Tribune*, *USA Today*, *The New York Daily News*, *Jet* (magazine), *The Miami Herald and The Los Angeles Times*, among others.  See, e.g., Applicant's Second Notice of Reliance.

Applicant also made of record articles featuring GRAND CANYON WEST from publications outside the United States, including Australia, New Zealand, Canada and the United Kingdom.  While articles from foreign countries often lack probative value in our proceedings, in this case we find the articles probative because the record also establishes that the potential customers for applicant's services, that is, visitors to GRAND CANYON WEST, often travel from foreign countries to avail themselves of the services applicant offers at GRAND CANYON WEST.  *Id.*

By August 2007, applicant employed 300 people in the operation of GRAND CANYON WEST and averaged 2,000 visitors per day.  Raskansky at 70.  Numerous tour operators were bringing visitors to GRAND CANYON WEST by air, bus, van and other similar vehicles.  At the time of the opening of the Skywalk, applicant was receiving 3 million hits (visitors) per month on its web site.  *Id.* at 61.

Opposer provides helicopter tours of the Grand Canyon from a site designated as GRAND CANYON WEST RANCH. Opposer's base of operation is at a ranch which is located

along the access road to applicant's GRAND CANYON WEST site, but not on applicant's property.  Prior to applicant's adoption and use of the GRAND CANYON WEST mark, the site of opposer's operation was known as the Diamond Bar Ranch. Opposer's sign now includes references to both Diamond Bar Ranch and GRAND CANYON WEST RANCH.  *Id.* at 52-54.  Applicant argues that Opposer's use of GRAND CANYON WEST RANCH causes confusion and violates its rights.  *Id.* at 55.  However, neither likelihood of confusion nor any alleged violation of applicant's rights is at issue in this proceeding; rather, the only issues in this proceeding are opposer's claims in opposition to the registration of applicant's mark.

The Descriptiveness Claim

In the notice of opposition opposer asserts that GRAND CANYON WEST is unregistrable under Trademark Act Section 2(e) without specifying whether Section 2(e)(1) or 2(e)(2) applies.  In its brief applicant responds with alternative arguments under both subsections.  Furthermore, opposer also argues, in the alternative, that applicant failed to show acquired distinctiveness under Trademark Act Section 2(f) as to both.  Applicant has responded to the arguments under both subsections.  Similar analysis applies to both Section 2(e)(1) and 2(e)(2), and we reach the same conclusion as to both.  That is, we conclude that GRAND CANYON WEST is merely descriptive and/or primarily geographically descriptive of

8

applicant's services.  However, we conclude that applicant's evidence of acquired distinctiveness is more than sufficient and therefore, we dismiss opposer's claims under Section 2(e).

In a case such as this, where applicant amended the application to seek registration based on a claim of acquired distinctiveness under Section 2(f), we could treat the lack of distinctiveness as an established fact and forgo any discussion on that point.  *See, e.g., Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1679-80 (TTAB 2007).  However, in this instance, we will address the arguments of the parties regarding the descriptiveness of the mark for completeness and to establish a foundation for our discussion of the issue of acquired distinctiveness.

First we consider whether GRAND CANYON WEST is merely descriptive under Section 2(e)(1).  A term is merely descriptive if it immediately describes a significant quality, characteristic, function, feature or purpose of the services with which it is used.  *In re Gyulay,* 820 F.2d 1216, 3 USPQ2d 1009 (Fed. Cir. 1987).  We must consider the term at issue in the context in which it is used, not in the abstract.  *In re Abcor Development Corp.,* 588 F.2d 811, 200 USPQ 215, 218 (CCPA 1978); *In re Remacle,* 66 USPQ2d 1222, 1224 (TTAB 2002).  That is, we must assume that prospective consumers will encounter the term in relation to the

identified services and determine whether those consumers will understand the term to convey information about the services. *In re Tower Tech, Inc.,* 64 USPQ2d 1314, 1316-1317 (TTAB 2002); *In re Patent & Trademark Services Inc.,* 49 USPQ2d 1537, 1539 (TTAB 1998); *In re Home Builders Association of Greenville,* 18 USPQ2d 1313, 1317 (TTAB 1990); *In re American Greetings Corp.,* 226 UPSQ 365, 366 (TTAB 1985).

Finally, in determining whether a mark is merely descriptive, we must consider the mark in its entirety. *See Concurrent Technologies Inc. v. Concurrent Technologies Corp.,* 12 USPQ2d 1054, 1057 (TTAB 1989). In this regard, applicant argues that the order of the words in this case, that is, the placement of WEST after GRAND CANYON, negates any descriptive meaning which might otherwise be inherent in the component parts of the mark.

The mark is GRAND CANYON WEST. The services are "airport services; air transportation services; arranging for recreational travel tours and providing related transportation of passengers by air, boat, raft, bus, and motorized on-road and off-road vehicles."

For the record, GRAND CANYON is defined in the *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) under "Geographical Names" as follows: "**Grand Canyon** gorge of the Colorado NW Ariz. extending from the mouth of the Little

Colorado W to the Grand Wash Cliffs; over 1 *mi* (1.6 *km*) deep; area largely within **Grand Canyon National Park…**"[1]

Each of applicant's witnesses and virtually all of the publications applicant submitted either explicitly or implicitly recognize the Grand Canyon as a natural wonder and a popular tourist destination. The record also establishes beyond question that the west rim of the Grand Canyon is the focus of applicant's services. That is, the purpose of applicant's airport, air transportation and other transportation services is to bring visitors to the west rim of the Grand Canyon to enjoy applicant's recreational and tour services featuring the wonders of the west rim of the Grand Canyon. Thus, GRAND CANYON describes the fundamental purpose or object of the identified services, and WEST simply identifies more precisely where along the Grand Canyon applicant offers those services. Accordingly, we conclude that GRAND CANYON WEST is merely descriptive of applicant's services within the meaning of Section 2(e)(1). We find unpersuasive applicant's argument that the placement of WEST after GRAND CANYON in the mark alters the descriptive character of the mark.

---

[1] The Board may take judicial notice of dictionary definitions. *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

We now turn to consideration of GRAND CANYON WEST under Section 2(e)(2). To determine whether GRAND CANYON WEST is primarily geographically descriptive of applicant's services we must determine: (1) whether the primary significance of the mark is as the name of a place which is generally known; and (2) whether relevant purchasers would associate the services of applicant with the place named, that is, whether the public would believe that the services come from the place named. *In re Societe Generale des Eaux Minerales de Vittel S.A.*, 824 F.2d 957, 3 USPQ2d 1450, 1452 (Fed. Cir. 1987); *In re JT Tobacconists*, 59 USPQ2d 1080, 1081 (TTAB 2001); *In re California Pizza Kitchen Inc.*, 10 USPQ2d 1704, 1705 (TTAB 1988). The two questions are bound together, that is, there can be no services-place association if the place named is so obscure or remote that purchasers of the service at issue would not recognize it as a place. *Vittel*, 3 USPQ2d at 1452.

We have already concluded based on this record that the Grand Canyon is a place that is generally known and not obscure. *See also In re Spirits of New Merced LLC*, 85 USPQ2d 1614 (TTAB 2007) (YOSEMITE BEER held primarily geographically descriptive for beer). Furthermore, based on the record before us, we also conclude without hesitation that relevant consumers would associate applicant's services with the Grand Canyon. See *In re U.S. Cargo Inc.*, 49 USPQ2D

12

1702 (TTAB 1998) (U.S. CARGO held primarily geographically descriptive for towable trailers carrying cargo and vehicles and for commercial purposes); *In re Chalk's Int'l Airlines Inc.*, 21 USPQ2d 1637 (TTAB 1991) (PARADISE ISLAND AIRLINES held primarily geographically descriptive for transportation of goods/passengers by air).  As we have already stated, the Grand Canyon is the entire focus of applicant's services. In fact, applicant's services would serve no purpose but for their location at the Grand Canyon.

In this context as well, we again reject applicant's argument that the placement of WEST after GRAND CANYON in the mark in any way alters its character.  *In re Joint-Stock Co. "Baik"*, 80 USPQ2d 1305 (TTAB 2006) (BAIKAL portion of "BAIKALSKAYA" mark for vodka is name of place known generally to public, since Lake Baikal is not remote or obscure place; BAIKALSKAYA, adjectival form of geographical term, likewise geographical).  In fact, WEST enhances the geographically descriptive significance of the mark by providing further specificity to the geographical place indicated by the mark.

In particular, we have carefully considered applicant's arguments that its mark is not primarily geographically descriptive based on *In re Pebble Beach Co.*, 19 USPQ2d 1687 (TTAB 1991) (17 MILE DRIVE held not primarily geographically descriptive of tee-shirt, sweatshirts, paper napkins,

13

ceramic mugs, canvas tote bags, and recreation services, namely, providing facilities for picnicking and sightseeing).  Applicant argues that, as in the *Pebble Beach* case, applicant coined the term GRAND CANYON WEST. Applicant also argues that it owns and controls access to the site associated with GRAND CANYON WEST, as in the *Pebble Beach* case.  In fact, we conclude that the record supports applicant's position on both points.  However, there is a fundamental difference between the mark at issue here and the mark in the *Pebble Beach* case.  Unlike the mark 17 MILE DRIVE, GRAND CANYON WEST consists of two terms GRAND CANYON and WEST which had geographical significance before applicant adopted the mark.  Although applicant "coined" the composite GRAND CANYON WEST in the sense that applicant was the first to use the term, nevertheless, the composite, from its inception, described a geographical place.  Furthermore, the fact that applicant uses GRAND CANYON WEST to identify a property which it owns and controls does not, by itself, remove it from the category of those terms which are "primarily geographically descriptive" under Section 2(e)(2).  Accordingly, we conclude that GRAND CANYON WEST is primarily geographically descriptive of applicant's services under Trademark Act Section 2(e)(2).

This conclusion is by no means the end of our inquiry regarding opposer's claims under Section 2(e) of the Act.

Applicant asserts, in the alternative, that GRAND CANYON WEST has acquired distinctiveness under Section 2(f). Opposer, on the other hand, also argues, in the alternative, that applicant has failed to establish acquired distinctiveness. As we noted above, we agree with applicant.

In an opposition proceeding, opposer has the initial burden to present prima facie evidence or argument upon which we could reasonably conclude that applicant's mark has not acquired distinctiveness. *Yamaha Intl. Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1004-1008 (Fed. Cir. 1988). If opposer does so, the burden of proof shifts to applicant to prove by a preponderance of the evidence that the mark has acquired distinctiveness. *Id.*

In this case opposer has argued that the mark is merely descriptive and that applicant has not shown that the mark has acquired distinctiveness. Opposer states:

> … Applicant's mark has not acquired a "secondary meaning" within 15 U.S.C. § 1052(f). Under 15 U.S.C. § 1052(f), a mark acquires secondary meaning, and is therefore trademarkable, if it becomes "distinctive of applicant's goods in commerce." See Hoover Co. v. Royal Appliance Mfg. Co., 238 F.3d 1357, 1360 (Fed. Cir. 2001). The factors to be considered in determining whether a secondary meaning has been achieved include: "(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of claimed use of the trademark, and (4) whether the claimed use of the trademark

15

has been exclusive." <u>Levi Strauss & Co. v. Blue Bell, Inc.</u>, 778 F.2d 1352, 1358 (9th Cir. 1985)(en banc).[2]

Opposer's Brief at 10.

We conclude, based on opposer's argument and the record, that opposer has satisfied its burden of establishing a prima facie challenge to the adequacy of applicant's evidence of acquired distinctiveness. *Id.* Accordingly, we will proceed to consider whether applicant has established that GRAND CANYON WEST has acquired distinctiveness by a preponderance of the evidence.

The circumstances of the particular case dictate the type and amount of evidence which is sufficient to establish that the mark has acquired distinctiveness. *Yamaha Intl. Corp. v. Hoshino Gakki Co. Ltd.*, 6 USPQ2d at 1008.

As an initial matter, before considering the sufficiency of applicant's evidence of acquired distinctiveness, we analyze the degree of descriptiveness of GRAND CANYON WEST because that fact will have a bearing on the amount of evidence required to show acquired distinctiveness. *Yamaha Intl. Corp. v. Hoshino Gakki Co. Ltd.*, 6 USPQ2d at 1008 (the greater the degree of

---

[2] We note that both opposer and applicant have cited 9th Circuit authority extensively in their briefs. While we believe our conclusions are entirely consistent with those cases, we have relied primarily on precedent from the Federal Circuit, not only because the Federal Circuit is our primary reviewing court, but also because its cases address registration issues more specifically.

descriptiveness, the heavier the burden in proving that the mark has acquired distinctiveness). *See also Target Brands Inc. v. Hughes*, 85 USPQ2d 1676 (TTAB 2007).

We conclude that GRAND CANYON WEST is highly descriptive. GRAND CANYON identifies a well-known place and WEST is a common term to indicate location. Even though there is no evidence of use by anyone other than applicant (and opposer) of GRAND CANYON WEST, and even though applicant has complete ownership and control over the property GRAND CANYON WEST identifies, we nonetheless conclude that GRAND CANYON WEST is highly descriptive. *Cf. In re Pebble Beach Co.*, 19 USPQ2d at 1688-1690. The fact that the GRAND CANYON is well known and the GRAND CANYON is the focus of the identified services is paramount here. As we noted, the addition of WEST does nothing to alter the essential character of the overall mark. Accordingly, we conclude that GRAND CANYON WEST is highly descriptive of the identified services. Consequently, applicant faces a heavy burden in establishing acquired distinctiveness for the mark.

At the outset, we reject opposer's argument that opposer's own use either negates applicant's claim to substantially exclusive use or otherwise impairs applicant's claim of acquired distinctiveness. *See L.D. Kichler Co. v. Davoil Inc.*, 52 USPQ2d 1307 (Fed. Cir. 1999). It is

abundantly clear from the record and the parties' arguments that applicant regards opposer's use as infringing. Opposer only began its use after applicant and with full knowledge of applicant's use.

Also, contrary to opposer's suggestion, we may consider evidence of distinctiveness after the filing date of the application through the course of this proceeding. *See McCormick & Co. v. Summers*, 354 F.2d 668, 148 USPQ 272 (CCPA 1966); *Harsco Corp. v. Electrical Sciences, Inc.*, 9 USPQ2d 1570 (TTAB 1988); and *Kaiser Aluminum & Chemical Corp. v. American Meter Co.*, 153 USPQ 419 (TTAB 1967).

Under the circumstances of this case, we conclude that GRAND CANYON WEST has become distinctive of the services identified in the application. We conclude so principally based on: (1) the length of applicant's use, that is, for nearly twenty years; (2) the extent of applicant's use in advertising and promotion; (3) the increasing and now substantial levels of sales, that is, visitors to GRAND CANYON WEST; and (4) the level of awareness of applicant's services and the GRAND CANYON WEST mark as evidenced by the substantial level of media coverage. Applicant's evidence is more than sufficient to show that this highly descriptive mark, GRAND CANYON WEST, has acquired distinctiveness.

Opposer also argues that applicant's failure to submit a survey all but precludes a finding that applicant's mark

18

has acquired distinctiveness. Opposer's Brief at 10-11. We reject this argument. There is no "requirement" for a survey, or any other specific type of evidence, to show acquired distinctiveness. *Yamaha Intl. Corp. v. Hoshino Gakki Co. Ltd.*, 6 USPQ2d at 1008.

Accordingly, we conclude that GRAND CANYON WEST has acquired distinctiveness, and we dismiss the opposition based on the claim of descriptiveness under Trademark Act Section 2(e).

### The Fraud Claim

We now turn to consideration of opposer's claim of fraud. Even though we have dismissed opposer's descriptiveness claim, if we find fraud, we must sustain the opposition. In our earlier decision in this case, the Board ruled on (1) applicant's motion to amend the identification of services and (2) opposer's motion for summary judgment on the claim that the application was void because at the time the application was filed applicant had not used the mark in commerce in connection with certain services then specified in the application.

When these motions were filed, applicant identified its services as "airport services; air transportation services; arranging for recreational travel tours and providing related transportation of passengers by air, boat, raft, rail, tram, bus, motorized on-road and off-road vehicles,

19

non-motorized vehicles featuring bicycles, and domestic animals." *Grand Canyon West Ranch LLC v. Hualapai Tribe*, 78 USPQ2d at 1696. In the decision, the Board granted applicant's motion to delete references to "rail, tram" and "non-motorized vehicles featuring bicycles, and domestic animals" from the identification of services. In its summary judgment motion, opposer had asserted that applicant had not used the mark with regard to these services prior to filing its application. In reaching this decision the Board stated, "Applicant has filed a motion to amend its application to delete the services for which opposer claims applicant did not use the mark as of the filing date of the application. In so doing, applicant has essentially agreed to accept judgment with regard to those services." *Id*. at 1698. Furthermore, in its conclusory paragraph the Board stated:

> Opposer's motion for summary judgment is granted only to the extent that judgment is entered against applicant on the ground that applicant did not make use of its mark in connection with the following services: providing transportation of passengers related to recreational travel tours by means of rail, tram, non-motorized vehicles featuring bicycles, and domestic animals.

*Id.*

After that summary judgment decision, opposer successfully amended its notice of opposition to assert a new claim of fraud. Specifically, opposer asserted that applicant had committed fraud by filing the application with

a claim of use on the services which the Board deleted in the summary judgment decision.

The standard of proof for a fraud claim is the rigorous clear-and-convincing-evidence standard, and it is strictly applied. *Standard Knitting Ltd. v. Toyota Jidosha Kabushiki Kaisha*, 77 USPQ2d 1917, 1926 (TTAB 2006); *Smith International Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB 1981). *See also Torres v. Cantine Torresella S.r.L.*, 808 F.2d 46, 1 USPQ2d 1483, 1484-85 (Fed. Cir. 1986); *Medinol Ltd. v. Neuro Vasx Inc.*, 67 USPQ2d 1205, 1209 (TTAB 2003); *Mister Leonard Inc. v. Jacques Leonard Couture Inc.*, 23 USPQ2d 1064 (TTAB 1992); *First International Services Corp. v. Chuckles Inc.*, 5 USPQ2d 1628, 1636 (TTAB 1988).

At this stage of this case we are bound by our earlier determination that, at the time applicant filed this application, applicant was not using the mark in commerce in connection with "providing transportation of passengers related to recreational travel tours by means of rail, tram, non-motorized vehicles featuring bicycles, and domestic animals" even though applicant claimed such use. We also note that it was not until the application was challenged in this opposition proceeding that applicant sought to amend its application to delete these services. *See University Games Corp. v. 20Q.net Inc.*, __ USPQ2d __, Opposition Nos. 91168142 and 91170668 (TTAB, May 2, 2008).

21

Applicant attempts to distinguish this case from previous cases which found fraud based on false claims of use as to particular goods or services. Applicant argues principally that applicant added references to the services in question in an examiner's amendment based on a misunderstanding of USPTO requirements and procedures.

First, we must review the steps in the prosecution of this application leading up to the examiner's amendment in question. The application, as filed, identified the services as "airport services; air transportation services; arranging for recreational activities and tours and providing related transportation."

In the first Office action, the Examining Attorney found the identification of services indefinite and required amendment. Applicant failed to provide a sufficiently definite revised identification in its first response.

In the second office action, the Examining Attorney repeated the requirement and, in relevant part, stated, "The means of the 'RELATED TRANSPORTATION' (by air, bus or train) and the matter transported (e.g., 'freight' or 'passengers') must be stated." The Examining Attorney also suggested a revised identification stating, "The applicant may adopt the following amended statement of services and the corresponding classification of the same, if applicable." Second Office Action (emphasis added). In relevant part,

the suggested language specified, "… ARRANGING FOR RECREATIONAL <u>TRAVEL</u> TOURS AND PROVIDING RELATED TRANSPORTATION <u>OF PASSENGERS BY AIR, BOAT, RAIL OR BUS</u>." *Id.* (emphasis in the original).

Following the second Office action, applicant's attorney, Shahpar Shahpar, agreed to the following identification in an examiner's amendment: "airport services; air transportation services; arranging for recreational travel tours and providing related transportation of passengers by air, boat, raft, rail, tram, bus, motorized on-road and off-road vehicles, non-motorized vehicles featuring bicycles, and domestic animals." This was the operative identification when the mark was published for opposition and when this proceeding began.

The examiner's amendment included the following language, "No response is necessary unless there is an objection to the amendment. If there is an objection to the amendment, the applicant should notify the examining attorney immediately." Examiner Amendment of March 2, 2004.

Applicant states that Mr. Beattie, its representative, conferred with its attorney, Shahpar Shahpar, before its attorney authorized the examiner's amendment. Applicant argues:

> … the most plausible inference is that Mr. Beattie
> read the recitation of services as finally amended
> by the trademark examiner within the context of
> "his understanding of trademark law" and the way

23

in which the Applicant actually uses its mark to "arrange for related transportation" and concluded that the examining attorney's list was applicable or appropriate. From Mr. Beattie's point of view, the applicant had attempted (albeit unsuccessfully at the time) to arrange for horseback rides, and bicycle tours, and tractor-based tram rides. So, even if the Board ultimately finds that Mr. Beattie misunderstood what constitutes trademark use, that does not equate with fraud. If error was introduced by Applicant's silence to the examining attorney's amendment, it was neither intentional nor reckless, but inadvertently made in the context of; (sic) an examining attorney's puzzling wording of a recitation of services; a layman's understanding of what constitutes trademark use; and a layman's innocent and reasonable reliance on the examining attorney's instructions suggesting "appropriate" or "applicable" recitations of services.

Applicant's Brief at 36-37 (citations omitted).

Applicant also argues that the circumstances of this case differ from the cited fraud cases because an examiner's amendment is unlike the verified statement of goods in an affidavit of continued use, as in the *Mister Leonard* case, or a statement of use, as in the *Medinol* case.

We have considered all of applicant's arguments, including those not specifically mentioned here, and find them unpersuasive. The clear message of the cases involving false claims of use of the mark on goods or services, wherever they may appear, is that these statements are essential to the integrity of the application and registration process. See, e.g., *Standard Knitting Ltd. v. Toyota Jidosha Kabushiki Kaisha*, 77 USPQ2d at 1926; *Medinol*

24

*Ltd. v. Neuro Vasx Inc.*, 67 USPQ2d at 1209; *Mister Leonard Inc. v. Jacques Leonard Couture Inc.*, 23 USPQ2d at 1064; *First International Services Corp. v. Chuckles Inc.*, 5 USPQ2d at 1636. In an application or registration, the identification of goods or services defines the scope of the rights claimed. Trademark Act Section 7, 15 U.S.C. § 1057.

Furthermore, as a practical matter, the USPTO depends on the accuracy of information provided by applicants and registrants regarding an applicant's or registrant's goods and services. The USPTO has no ability to verify the truth of identifications and other critical information independently. Consequently, when an applicant or registrant provides false information as to a critical element of the application or registration, in determining intent we apply a test of whether the applicant or registrant knew or should have known that the information in question was false. See *Torres v. Cantine Torresella S.r.L.*, 1 USPQ2d at 1484; *Medinol Ltd. v. Neuro Vasx Inc.*, 67 USPQ2d at 1209.

We have considered applicant's arguments and conclude that applicant either knew or should have known that the statements regarding its services in the examiner's amendment were false. In fact, applicant did not adopt the Examining Attorney's suggested identification presented in the previous office action in the telephone conversation

25

between applicant's counsel and the Examining Attorney; it is evidence that applicant provided input in the identification specified in the examiner's amendment in the course of the telephone conversation between applicant's counsel and the Examining Attorney. For example, it includes references to rafts, bicycles and domestic animals, items not specified/suggested by the Examining Attorney in the preceding Office action. Nor can we excuse the false statement on the basis of a misunderstanding or miscommunication by applicant's representatives. *See Mister Leonard Inc. v. Jacques Leonard Couture Inc.*, 23 USPQ2d at 1064. It is applicant's responsibility to ensure that accurate information is transmitted to the USPTO. In this case applicant had the additional benefit of guidance from counsel. Furthermore, counsel had the opportunity to request guidance from the examining attorney.

We likewise reject applicant's arguments based on redundancies or ambiguities in the language leading up to the examiner's amendment. The identification set forth in the examiner's amendment was, at least in part, false, and it was applicant's responsibility to correct it promptly as the action invites. Applicant's identification refers to a discrete listing of distinctly different types of transportation. The items at issue here in the identification are not highly technical, nor are they terms

which leave room for confusion as to meaning, particularly for an applicant engaged in the relevant business. *See, e.g., Medinol Ltd. v. Neuro Vasx Inc.*, 67 USPQ2d at 1209.

Lastly, we see no reason to treat this case differently because the communication of the information was not verified. *Global Maschinen GmbH v. Global Banking Systems, Inc.*, 227 USPQ 862, 867 (TTAB 1985) (Fraud found where unverified answer to Examining Attorney's inquiry was "recklessly false."). The accuracy of the information applicant provided in agreeing to the examiner's amendment was no less critical to the application than the information applicant provided in the application as filed. The integrity of the registration system rests on the accuracy of the information provided in either form. Applicants must ensure that all information they provide is true and accurate whether or not it is verified.

Accordingly, we conclude that applicant committed fraud by including certain services in its revised identification of services when applicant knew or should have known that it had not used the mark in connection with those services.

Finally, we note that this determination of fraud affects only the application before us. It does not affect any rights applicant may have legitimately established by virtue of its use of the GRAND CANYON WEST mark with respect to specific services, nor does it affect applicant's ability

27

to file a new application to register its mark for such services.

   **Decision**:  We dismiss the opposition based on the claim of descriptiveness under Trademark Act Section 2(e) and sustain the opposition based on the claim of fraud. Registration is refused.